Case number 21-3418, Travis Abbott et al. v. E I du Pont de Nemours & Co. Donald Mace for the appellant. You may proceed. Oral argument not to exceed 15 minutes per side. Good morning. May it please the Court. My name is Damon Mace. I'm from the Cleveland Office of Square, Patent, and Blogs. I represent the appellant du Pont. I'd like to reserve three minutes for rebuttal. Your Honors, there are three issues that require reversal here. First, collateral estoppel. Black letter law says that without special interrogatories, a general negligence verdict cannot decide the individual negligent cases of other mass tort plaintiffs. Here, the early trials were focused on very different negligence claims than the Abbott case. They were mostly failure to warn cases. But Mr. Abbott's expert admitted that Abbott's water came from much farther away from du Pont's plant. The levels never exceeded du Pont's internal safety guidance. And du Pont had no reason to warn him. Moreover, Mr. Abbott testified that he didn't pay attention to anything about C-8. So even if a warning had been issued, it wouldn't have mattered for him. Well, didn't you cover all of, I guess, the process issues and everything in the Leach agreement and determine that in that agreement, the issues that would be at issue in these subsequent things were guided and governed by that overarching umbrella agreement? There is an umbrella agreement, very true, Your Honor. But with regard to the current cases, what that agreement did was it preserved the right to bring individual cases. Even in bringing those individual cases, it seems to me that under that agreement, there were parameters set out about what would and would not be permissible or what would not be re-decided. And I don't know that the Abbott case markedly covered different things than were there. I know his case came later, but don't you have a collateral estoppel problem there? Well, no, Your Honor. And the only issue with regard to the individual trials that was addressed in the Leach agreement was general causation. All of du Pont's other defenses were preserved, including negligence, including specific causation, including damages. The verdicts in these cases were simple one question, one plaintiff liability verdicts. Do you find for Mr. Vigneron, if so, how much? The reasons underlying those general verdicts. But weren't the instructions about a person in the position of Mr. Vigneron? A person in the position, true, and that's where these liability fact differences come in, Your Honor. But isn't, before we get there, I know you're talking about Freeman and Vigneron, but you're ignoring Bartlett. No, Your Honor, we haven't ignored Bartlett at all. But isn't it, wasn't Bartlett factually very similar to this case? No, Your Honor, it wasn't. Were they in the same water district? No, they weren't, because Bartlett was primarily Tupper's Plains. Abbott, in his brief at page six, acknowledges that, I'm sorry, Bartlett was primarily Tupper's Plains. Abbott's brief acknowledges that he grew up in Pomeroy, which is much farther down river than Tupper's Plains. So that's one of the things here. We have six different water districts that are very, very different in terms of the liability facts. So in the trials that they picked, trials two and three, they involved Little Hocking. Little Hocking was a water district where they claimed DuPont knew for ten years that the levels exceeded DuPont's safety guidance and that they didn't warn them. Those cases were focused on a duty to warn that didn't apply to Abbott and even in Bartlett. Proximity to the plant, Your Honor. Wasn't Bartlett's issue not the DuPont guidelines also? I know Freeman and Vigneron, the arguments related to the known existence and the guidelines, but I think my understanding of both Bartlett and Abbott is that they made a similar argument regarding the C8 exposure that is different from what Freeman and Vigneron argued. That's the point I was on, Your Honor. So to put it in concrete terms, if we would picture this courthouse as the DuPont plant, let me talk about the four plaintiffs. So Vigneron and Freeman were getting their water less than a quarter mile away from the plant. That's not even the great American ballpark. So in terms of the foreseeability of injury to someone in the position of those plaintiffs, Bartlett was about 14 miles away, her water source. So that's like somebody down in Florence. But help me understand how that matters where the governing principle in this case is not common law negligence rules, but the closed class of plaintiff's right that was established through the leach agreement to which your client agreed. There were no changes to negligence in the leach agreement. It's expressly set forth that the individuals would bring individual lawsuits and regular rules would apply. There was no change to negligence law, and the district court recognized that. I'm struggling with understanding that argument because, in fact, what the leach agreement did was created its own closed class in a somewhat unusual scientific methodology. And then it said, if you are one of the, was it six or eight, I can't remember, cancers that are found to have a link, then you may bring a case. But everyone who was not in that group, all of those other 80,000 plaintiffs, could not bring a case under any circumstances. They could not come back and argue what you're arguing here. Well, my exposure was different, or I was near enough to this plant, or I had a specific bodily concern that made this exposure exacerbate something that I had. They were all gone, right? Isn't that how that worked? Well, it's two different issues, Your Honor. So first of all, it's diseases. So the science panel determined a probable link was six diseases, six very different diseases. So if you didn't have one of those six diseases, you couldn't bring an individual suit. But once you get past that, then if you are allowed to bring an individual suit, you still have to establish negligence, which part of that is, was it reasonably foreseeable to DuPont when it took some act or failure to act, that it was likely to cause injury? And that's where I'm trying to explain that the six water districts were dramatically different. And remember the 60 years time frame involved here. So one of the, so I was getting, finishing my analogy. So imagining this courthouse is the DuPont plant. Mr. Abbott lived, he got his water sourced more than 50 miles away. That's like somebody in Dayton claiming you should have foreseen injury to me. And then you have people like Schwartz, who was tried with Abbott, that is like a drive-by plaintiff. She did not even live in one of the six water districts. She claimed she occasionally visited her sister. So the foreseeability issue as part of a negligence determination was dramatically different for different individual plaintiffs and for different water districts. And my point on the 60 years. Wasn't the expectation in the Leach Agreement that there were all of these moving factors among a group of 80,000 people? And the agreement that was entered said, we are going to do this study and then we're going to say if you are in a non-linked, where the link was not established, even if you lived next door to the plant, even if you could show that you had double or triple the exposure that someone else further down had, it doesn't matter. Because this is governed by the law established in the agreement that you entered. But that's the point, Your Honor. It didn't establish law on basic negligence. It established for the people who were excluded. It only established that DuPont would not contest general causation. But let me focus on, I see my time is up. Yeah, only general causation on those. If I could focus on black letter law. All that was dissidered were one question plaintiff, individual plaintiff verdicts. Do you find for Mrs. Bartlett? Do you find for Mr. Vigneron? Now, there's no elucidation on what theory of negligence the jury adopted for that. Some of these theories of negligence did not apply to other people. And my point on the 60-year time knowledge, the analytical ability to test for C8 changed over those decades. So people out in Mason County, even people that were out in Pomeroy, one of the theories was failure to test the water. Even if DuPont had tested, the analytical capabilities weren't sufficient in those early years to even see it. All those issues were different. And I understand that argument. I would like you, before your time is up, to address the collateral estoppel issue and your argument that Benedictine bars the use of collateral estoppel. Well, that's where the fundamental difference, Your Honor, between MDLs, multi-district litigation, and class actions come into play. Because what's happening here is it's essentially an after-the-fact, backdoor attempt to obtain a Rule 23 issue class without any of the protections of Civil Rule 23. No determination that this plaintiff is a representative of all the thousands of other plaintiffs. No ability for DuPont to appeal, do an interlocutory appeal on was it proper to certify a class. Here, after the fact, we have two cherry-picked plaintiffs by the Plaintiffs' Council that had unique facts. And how can two cherry-picked plaintiffs that were their best cases out of 3,500 find liability for tens of thousands? Let's back up. Because you chose cases also, didn't you? Well, see, that's where it gets into this difference between MDLs. So the fact that the early trials are not preclusive in an MDL, it's the oil that lets MDLs work. Because when an MDL is issued and you start the early trials, there's a lot of discussion about, well, who are the bellwethers? Who are the early trials going to be? So because they're not preclusive, and here the district court expressly assured the parties these would not be preclusive, and expressly told the jury this is a one-plaintiff trial. Here, because they weren't preclusive, DuPont picked the Bartlett case because it was kind of a middle-of-the-road case. She lived kind of in the middle of the distances. And that's what MDLs allow you to do if they're not preclusive. The plaintiffs, on the other hand, picked their best cases. So the fact that they... I don't think we're litigating attorneys' choices in the case. No, no, no. You had an opportunity to pick whatever you wanted, and you did. I'm sorry. So now what we're talking about is what is available. Whether the original trials, not the first one, which was clearly not preclusive because the judge did not take up the preclusive issues until after three trials, right? And a number of settlements. Is that correct? Yes, three trials. But that's the way MDLs work. You try cases for informational purposes and to try to get settlement. I mean, even the plaintiffs' counsel, and this is at page 36 of their brief, everyone agreed from the beginning that bellwethers here were not binding, but instead the results might inform the conduct of future trials and potentially settlement. That's how MDLs work. That's why they've been so successful in trying to help the federal courts resolve half their caseload is in MDLs. But if you make the initial trials preclusive, there's going to be all-out battles on the initial trials. I'm just struggling with understanding. They were not made preclusive, as I understand it. They were bellwether trials. No one claimed. The court did not tell you as you tried them that they were preclusive. What happened was after three verdicts and multiple settlements, the court looked to the doctrine of offensive, non-mutual collateral estoppel and found that that doctrine was satisfied. But, Your Honor, two circuit courts have held that you can't do that in an MDL. The Chevron case we cited to you and Dodge, and the district court case that Mr. Abbott has cited to you, air crash at Detroit Metro, that shows the issue. There, everybody knew in advance what issues it would be preclusive. And there was an 18-month trial on those issues and a 35-question special verdict. So there would be no speculation about what that jury found. Here, Parkland was very clear that one of the standards is, is it unfair to the defendant? It's unfair to the defendant when you don't know what issue you're going to be precluded on. And it's especially unfair when the trial court does a 180-degree flip, assures you that they will not be preclusive, and then after the fact says, okay, now they are going to be preclusive. What's your best argument for why the four components of collateral estoppel are not satisfied here? Because the identical issue was not necessary to the judgment in the earlier cases. Those negligence, there were abundance of negligence theories. Many of those didn't apply to Mr. Abbott. We should have been allowed to argue those. And now under the district court's ruling, we have potentially 75,000 more individual plaintiffs that can sue us, and we can't contest negligence liability no matter how far away they live from the plant, no matter if they're a drive-by plaintiff like Ms. Schwartz, who just occasionally stopped in and visited a sister, no matter if they're- Did you get your 75,000 number from the people who were excluded? No, Your Honor. No, Your Honor. From the people who have one of the six or eight linked? Or may get them. Or may get them. Because we're going to have future cases. These are six commonly occurring diseases in the U.S. population. So for decades, we may have additional lawsuits. And this court is ruling that we cannot contest negligence liability for any of those plaintiffs, no matter how dramatically different they are. I wanted to ask you, because I know that time is fleeting, but you mentioned Park Lane. So am I to understand that you agree that the Park Lane factors should be applied in this action? Is that- Well, yes, Park Lane, I'm saying yes. The Blackletter Law of Park Lane was not met, and that's one reason the collateral estoppel- But aren't there already safeguards in place to ensure that to defendants such as the defendant in this case? So are you suggesting that we ought to pronounce some rule that fully insulates parties from the preclusive effect of collateral estoppel in these MDL cases? My argument, Your Honor, is that in an MDL, where the initial trials typically- I mean, that's the way MDLs work. I've been practicing almost 40 years. A lot of my practice have been MDLs. That's the way they work. You don't have to focus so much on the individual facts because you're trying to get information. And MDLs encourage you to take a different approach in different trials and get information to lead to a potential settlement. They've never been used, but they're going to be binding on all the future cases. Where you get-and I know you all have covered this before in your questions from Judge Strange, but where you get these bellwether cases and the MDL is largely to basically create efficiencies and lower costs for all the parties involved. So if you try these, you know, the bellwether cases and you get a result, isn't it then unfair to say to plaintiffs who are similarly situated that you can't use the findings from those trials to prevent relitigating those issues that predominate in these cases? Actually, Your Honor, it's the exact opposite of that. Okay. Because the plaintiffs have never, never contended that if DuPont had won the first two or three trials that none of the other 75,000 individuals would be precluded. I mean, we wouldn't have gotten a dismissal. So again, on the unfairness point that Park Lane mandates, I mean, it's just fundamentally unfair to the defendant that if you have these cherry-picked initial trials or ones that aren't representative of the pool and you don't even know in an MDL what all the cases are going to be. That's why it helps the system. Because you can start trying cases, even though you don't know the entire pool, you get information and that helps you to resolve and value future cases. If you make them preclusive, there is going to be fire and brimstone because plaintiffs are going to try to pick their best case that's outliers. Defends are going to try to pick their best case that are outliers. There are going to be huge battles on that, all kinds of interlocutory appeals. If you get an issue, there's going to be long trials because it's going to bind tens of thousands of people. So it's just the exact opposite. It makes it unfair. Thank you. Thank you, Your Honors. I don't know if that's it. Did we ask Judge Batchelder? Oh, did you have something? Do you have anything else, Judge Batchelder? I'm sorry, Judge. No, I'm listening. Thank you. Okay. Sorry, I didn't mean to walk away. May it please the Court, Matthew Wessler for Travis and Julie Abbott, who are the appellees. The doctrine of collateral estoppel was tailor-made for this case. For more than 20 years, DuPont has been defending itself against the claims of thousands of people whose lives were upended by DuPont's conduct in its decades-long contamination of their water supplies. This case is the last of more than 3,600 cases that were filed against the company, and it comes after DuPont either settled or, as Your Honor noted, tried to verdict every other one. DuPont itself has acknowledged, and I think this is pretty important, that each and every one of these cases all involved, and I'm quoting here, the same core factual allegations regarding DuPont's conduct and, quote, raised similar theories of liability. In the three cases that reached verdict, the evidence that was introduced by the parties was virtually identical on the core issues of DuPont's negligence, its duty, breach, and foreseeability, and the jury was given, again, Judge Strange, as you noted, identical sets of jury instructions on these issues. In each, the jury resolved every relevant issue against DuPont, which prompted DuPont to take an appeal on the very issues that are in some ways now before this panel now, today, up to the Sixth Circuit, in an effort to get them reversed. What about Appellant's position that I guess the verdict form or whatever in this case should have been one with more intensive interrogatories that allowed the jury to really express on a variety of issues what their opinions were, that having this sort of general verdict form is somehow unfair? Sure. So what you heard from counsel on the other side was a statement that that is black-letter law and that it's required. And there is absolutely nothing black-letter or required about that. This Court's guiding case on whether the District Court correctly applied collateral estoppel is Park Lane Hosiery. That comes right from the Supreme Court. And, Judge Donald, as you identified, the Court did not require the use of any kind of special interrogatories or specific questions that need to be answered before a district judge may properly apply collateral estoppel. And that's for a good reason, which is that the factors that a court has to walk through when it's applying collateral estoppel already bake into it questions of fairness and due process for the defendant. It's not just the four factors that Park Lane Hosiery lays out. It is also, as the Court explained, several additional fairness safeguards that a court has to consider. That includes, for instance, the existence of inconsistent judgments, the possibility that a plaintiff strategically laid in wait and took a wait-and-see approach before filing their case. And none of those are relevant here. DuPont doesn't make any argument that somehow the plaintiffs here waited to see how the first three cases would play out before bringing their case to trial. These first three cases were picked by the parties. And the only authority that DuPont has identified for that proposition is this case from the Tenth Circuit called Dodge. It's the only one. And what you saw in Dodge is very different from what you see here. In Dodge, the plaintiffs in that case pursued at trial 11 separate theories of negligence against the defendant in that case. It spanned a wide range of different ways in which the defendant could have been liable. There was a theory of negligence about release, like there is here. But there was also a theory of negligence the plaintiff pursued based on negligent training of employees. There was another theory in that case the plaintiff pursued about the failure to warn. None of those theories were present in this case. The plaintiffs had other claims earlier on in the case, but they were dismissed or there was a summary judgment created against them. They only pursued a single claim of negligence in all of these cases. And the evidence was the same for all of them. And so in that context, Dodge that is, it may have made sense to require more specificity from a jury, but here where the evidence is the same, where the theory is the same, where the arguments are the same, nothing from the Supreme Court's decision in Parkland-Hosiery says anything more is required. And so what DuPont is actually asking when they got up here and said that's required is some sort of specialized rule for aggregate litigation and for mass torts. But there is no exception to the general basic equitable doctrine of collateral estoppel for mass torts or anything else. Your opposing counsel argues that the leach agreement, he can correct me if I misstate it, the leach agreement itself does not authorize the treatment of general causation in the way it was used in this case. Give me your position on this distinction between specific causation and general causation, because I think we're all in agreement. It was only general causation that was resolved by that agreement. That's absolutely correct. Now, as you, Judge Strange, noted earlier in this argument, it was general causation, but it was a specialized definition of general causation that doesn't necessarily reflect what the default understanding of general causation is in the law. And that was important because the plaintiffs, by having DuPont agree to a heightened understanding of general causation, what they gave up in exchange, there was a bargain there. That was what DuPont agreed not to contest in these trials. And in exchange, the plaintiffs agreed to give up any claim that they may have had for over 50 different kinds of diseases that anyone in the class could have experienced. That was the bargain for exchange. The definition of general causation here is that it is more likely than not that the CA contamination is capable of causing one of the six linked diseases. And that issue is... That was in the jury instructions, it was, or the jury statements that they looked to, it was the capable of causing one. Yes. Which I'm going to be sure about that. That's correct. More likely than not capable of causing. Capable, thank you. Correct. Now, that did not leave DuPont without any ability to try these cases. As you note, Judge Schranch, it still left on the table as a disputed issue specific causation. And that was not a fig leaf for DuPont. How do we know it was meaningful? How do we know that DuPont actually could have disputed that and won its cases? Well, there was a second case that was tried in conjunction with the Abbott trial, a woman named Ms. Schwartz. And DuPont put into testimony and evidence in the record in front of the jury arguments about specific causation, that her hypertension or obesity had caused her condition and not her exposure to C.A. And the jury did not return a verdict in favor of her. So there was ample room that DuPont had, even accepting the fixed definition of general causation to win its cases. But it failed to do that in Abbott. It failed to do that in Bartlett. Were there, in fact, scientific experts that testified for both sides in Abbott's case? There were scientific experts that testified for the plaintiffs. DuPont chose not to put on an expert for specific causation. It made that choice. So the jury was left to rely or not, but to either trust what the plaintiff's side expert said or not. But that was DuPont's strategic decision it made in this case. In contrast, in Ms. Schwartz's case, it did choose to put on a specific causation expert. Now, I will back up and just say, I think these issues about, you know, what the Leach Agreement means, whether DuPont can challenge that interpretation, or as Judge Sargis noted in his collateral estoppel order, any evidentiary application of the Leach Agreement has been waived by DuPont. They have not, and this is clear, challenged the part of Judge Sargis' order, DMO 34, applying collateral estoppel to the Leach Agreement interpretation and any related evidentiary applications of that interpretation. Instead, the argument arose in the context of evidentiary issues. Exactly. Exactly, Your Honor. Now, if I could just return back to collateral estoppel because I just want to make a few more brief points. I think in addition to this idea that what DuPont wants is a kind of exception to the general rules of collateral estoppel, what you see here is a classic case of a district judge who is the same district judge who oversaw all three trials, saw all the evidence, all the arguments, all the witnesses, gave the instructions to the jury and saw what happened, being in the best position to exercise its discretion to determine whether or not collateral estoppel should apply. What DuPont is asking for is the ability to endlessly re-litigate the same issue over and over and over again. And Park Lane Hosiery makes clear that that kind of inefficiency is exactly what collateral estoppel is designed to address. Your opposing counsel argues that Freeman and Vigneron are distinct enough that they should be allowed to put in and to challenge the negligence of duty or breach of duty. Why is that not correct? The same evidence relates, again, to the entire community of these six water districts. So regardless of whether one plaintiff was five miles away or one plaintiff was 14 miles away, the question that was put in front of the jury and that the parties argued over and that the evidence established wasn't the distance or proximity to the plant mattered. It was whether DuPont, and again, this negligence question focuses on the defendant's conduct, not any individual plaintiff and precisely where they were. That's relevant. It's relevant for specific causation, potentially, but it isn't relevant for questions of duty, breach, and foreseeability. And as the district court explained in its opinion in DM-034, the question of DuPont's duty and breach related to all six water districts that were affected by the release of C-8 from this plant. I want to ask you another question about the collateral estoppel for clarification. Was DuPont told that the bellwether trials would not have a preclusive effect on later proceedings? And if so, what makes the preclusive effect of the bellwether trials different from the preclusive effect of ordinary collateral estoppel principles? Yes. So let me answer that in a slightly different way. And you can tell me if I've answered your question. These bellwethers were not what are called binding bellwethers, which is a term of art that has been developed in the mass tort litigation context. And a binding bellwether is a case in which all the parties ahead of time, ex ante, before the first case has taken place, agree ahead of time that what happens in that case will categorically bind later cases that come along. So there are due process concerns related to a binding bellwether. Mostly, frankly, the due process concerns run to absent plaintiffs who don't necessarily have a chance to participate in that first case. But what, for instance, the Fifth Circuit in that Chevron case has said, is if you're going to have a binding bellwether that everybody agrees before anything has happened will bind later cases, there needs to be some safeguards like notice, like statistically robust analysis of cases that are representative of the rest. But what Judge Sargis said in this case, and this gets, I think, Judge Donald, to your question, is that the first case or the first several cases, they will not have preclusive effect in the sense that they are not binding bellwethers. So no one has to be concerned that anything that happens in those cases will automatically and forever bind later cases. But that says nothing about whether normal doctrines, equitable doctrines of federal common law could kick in later down the road once everyone has experienced one or several of these cases to decide that a version of race judicata would nevertheless apply. Because what Judge Sargis saw in these cases was the exact same evidence, the exact same arguments, and the exact same outcomes in the cases. And so those three cases were used as basically tools in the fashioning of the Leach Agreement. No. I would say they weren't used as tools in the fashioning of the Leach Agreement because the Leach Agreement came before those trials. But once, after the third trial had ended with a plaintiff's verdict based on the same evidence, Judge Sargis at that point exercised his discretion to apply the doctrine of collateral estoppel not on everything, just on issues of negligence in an effort to avoid the endless relitigating of the same issues. Your opposing counsel argues that NRA air crash disaster, our Sixth Circuit, that was 96 in the Sixth Circuit, does not indicate support for your argument but indicates support for DuPont's argument. Give me your analysis of the applicability of that case. I think I refer to that case as Benedictine. Are you referring to the... I'm referring, Benedictine is the 1984 case where there was a footnote dropped Right. that was at odds with Park Lane. Right. And NRA air, I think it was, yeah, it's the Metro air crash, Metro Detroit. The Sixth Circuit affirmed the statement that this court has rejected the contention that collateral estoppel should not be applied in mass disaster litigation, which seems to me a pretty clear statement that there's not a general rule that excludes mass cases from the use of collateral estoppel. I think that's exactly right. In fact, if, and, you know, I think Benedictine contains that, you know, what I think is an erroneous footnote taking the opposite view, Judge Strange, that collateral estoppel is somehow inapplicable to mass torts. It's fairly clear that Park Lane... case in which an earlier proceeding was then used as collateral estoppel to... I mean, in fact, I mean, the argument, a defendant might be better positioned to argue that the use of collateral estoppel in a class action is worse because it will automatically bind everybody in the class. In this case, the use of collateral estoppel was used only to bind DuPont in Abbott and Schwartz, only two cases. It isn't necessarily the case that collateral estoppel will, that Judge Sargis will automatically apply collateral estoppel down the road. Let's say, for instance, there were to be new evidence that no one could have discovered that would lead to a different argument that DuPont would be able to make on negligence. Then at that point, Judge Sargis, again, exercising the discretion that district courts have on this question, could opt to decline to apply collateral estoppel and require that the issue be litigated. So it's a case-by-case-by-case kind of analysis, and there's, I don't think, any support or rationale for attempting to create an exception to its use in the mass tort context. And as you stand here today, to your knowledge, how many of these cases still remain? And I understand people could come up tomorrow and say... Yes, Judge Donald. Yeah, I've got a cause of action. This is the last one. This is the last case. And so it would be, I think, particularly inefficient to force the plaintiffs in this case to re-litigate these issues yet again. This is the last case. There are no more cases in the pipeline. And at the time that Judge Sargis applied collateral estoppel, there were more, but those have since settled. And so we are really at the end at this point, barring the possibility that a latent injury could appear, but we are really at the end of what has been a 25- or 30-year long-running litigation, and I think it is time for this Court to put its final stamp on what has been a litigation that should have ended long ago. Unless the Court has no further questions. Thank you. Judge Batchelder? No, thank you. Rebuttal? Thank you very much. I'll try to be as concise and brief as I can. First of all, statute of limitations, a very important issue in this and other cases. Mr. Abbott's participation in the C8 health study, the explosion of news articles about C8 being linked to testicular cancer, the thousands of lawsuits that were filed by his friends and family and others living in his area, the class notices that were sent to class members make the statute of limitations a jury issue. The District Court ignored the statute. 2305.10b, specific for chemical exposure, says you have to evaluate reasonable diligence and what someone should have known. For the first time, the District Court has adopted essentially an ostrich defense for the plaintiff. All they have to do is come in and say, well, that may well be, but I didn't know, therefore I don't have to. Help me understand how that would relate to your argument that there might be 75,000 other cases out there, because we can see in the Abbott case that the dispute was relative to when he actually filed his case. Who else could be out there that's not in the pipeline now that could qualify for now bringing a new case? More than 75,000 people, Your Honor, because if two years from now somebody else gets testicular cancer, kidney cancer, ulcerative colitis, any of these six diseases, once they're injured. So there's two elements. The plaintiff has to know they were injured by the new or should have known that they were injured by the conduct of the defendant. All of these people know about conduct of the defendant. I mean, it's like a tornado went through town and somebody's going to try to claim, well, I didn't know anything about it. I mean, new or should have known, injured, conduct of the defendant. So the other element then will be injury. When did they first get diagnosed? Forty years from now one of these underlying people could get one of these diseases and sue. But what the court did, it entered summary judgment. It did not construe the evidence most favorably to the non-movement DuPont. It did not get all inferences in favor of DuPont. Let me hit specific causation briefly. So the district court here, Your Honor, had a good question about capable of causing because that was the debate the last time we were before the panel. And basically Bartlett's counsel told this court, so long as DuPont's experts say that C8 is capable of causing testicular cancer, then they can weigh the evidence. They can do all these things. But the exact opposite happened here. The experts complied with the early rulings and were still barred. And the district court allowed Abbott's counsel to repeatedly tell the jury that .05 was a cancer-causing level of C8. And the district court told the jury that that was the science panel's threshold. And it allowed use of the graphics, like on page 44 of our main brief, where they just used multiples of how many times he met class certification to try to imply that that was specific causation evidence. These were stated. Yes, Your Honor. So essentially what you're claiming here is that there is a real distinction between capable of causing and caused. Absolutely, Your Honor. Spot on. Because there was debate the last time we were before the panel, you know, was it really capable of causing or was it caused? It is absolutely crystal clear how this has morphed over the trials. And they're being allowed to tell the jury that if it's .05, it caused this cancer. Those are assumptions their experts are making. But Abbott's expert at deposition that was barred from the trial admitted the science panel never found that .05 causes cancer. A science panel member confirmed it in an affidavit. We never determined .05 causes cancer. The district court is the only person in the world who has said that .05 causes anything. It's just not. It's against the facts, and that's what we're being tarred with. Let me briefly on collateral estoppel before I have to sit down. So Your Honor was asking about the cases. So the problem is most of the cases that opponents cite to you, Your Honors, are not MDLs, and they're not personal injury tort cases. They're far different. So Dodge, Dodge is the Tenth Circuit. They said it forbade use of collateral estoppel without prior notice express agreement, and it reversed the use of a pencil of collateral estoppel on negligence issues. Chevron was the Fifth Circuit case. And there it was a mandamus ruling, clear that it precluded the use of claim preclusion, rejected the district court's plan to try 30 out of 3,000 cases to be preclusive. Here we had three out of 3,500, and we weren't told in advance. Thank you, Your Honor. Could you conclude, please? Okay. The issue has to be identical, not similar. In the one-sided, they did not address the fact that they want a one-sided rule. It's going to harm the defendants because if they happen to win the first couple, it binds them on thousands of other cases. It's not going to hurt them if the other side wins on those cases. It's not the last case. We talked about that. We appreciate that. All right. Thank you, Your Honor. I appreciate your time. We thank you for your consideration. We ask for reversal and remand. Have a great day and weekend. Thank you. Thank you, sir. We thank you both for your briefing in a complex case and your arguments. It will be taken under advisement and an opinion issued in due course. This is the only argument case for today, so you may adjourn court.